G. MARK ALBRIGHT, Esq. (State Bar No. 1394)
DANIEL R. ORMSBY, Esq. (State Bar No. 14595)
**ALBRIGHT STODDARD WARNICK & ALBRIGHT**
801 S. Rancho Dr., Suite D4
Las Vegas, NV 89106
Telephone: (702) 854-2791
gma@albrightstoddard.com
dormsby@albrightstoddard.com

Adam E. Polk (*pro hac vice* application forthcoming)
Jordan Elias (*pro hac vice* application forthcoming)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
apolk@girardsharp.com
jelias@girardsharp.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| STANLEY ANN DOWDY, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | Case No.:<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Stanley Ann Dowdy, on behalf of herself and all others similarly situated, alleges as follows against Defendant Wells Fargo Bank, N.A.:

## NATURE OF THE ACTION

1. This is a class action to recover investment losses suffered by Plaintiff and others who invested in a fraudulent scheme perpetrated by the J&J investment enterprise ("J&J") and substantially assisted by Wells Fargo. J&J marketed and sold unregistered securities that purportedly would give investors interests in personal injury settlements obtained by tort plaintiffs who were seeking short-term funding before receiving the settlement payments. Plaintiff Dowdy and other investors were told that their investments were safe and secure, and they would receive

///

payment of returns on their investment every 90 days.  In fact, the investor funds were misused and misappropriated by J&J, which paid returns using money from new investors, in Ponzi-like fashion.

2.   On March 3, 2022, FBI agents executed search warrants at the homes of J&J principals Jeffrey Judd and Matthew Beasley.  Beasley brandished a pistol and the agents shot him twice.  Beasley then locked himself inside for several hours.  A negotiation with the FBI ensued.  Before surrendering, Beasley confessed that the J&J investment enterprise was a Ponzi scheme.  On April 12, 2022, the SEC filed an enforcement action against J&J and others for injunctive relief, civil penalties and disgorgement.  On April 13, 2022, on motion of the SEC, a Temporary Restraining Order was entered in the SEC action, enjoining among other things, the movement of assets under the control of the co-conspirators in the J&J investment enterprise, and further enjoining transfers of funds held in the co-conspirators' accounts, including an attorney trust account maintained by Beasley on behalf of his law firm, the Beasley Law Group, PC, at Wells Fargo.

3.   Wells Fargo's account opening information for the Beasley Law Group's attorney trust account, known as an "IOLTA," or "interest on attorneys' trust account," stated that Annual Gross Sales for the Beasley Law Group was $350,000.  But from January 2017 through March 2022, at least $491.5 million flowed into the J&J investment scheme through the Beasley firm's Wells Fargo IOLTA account.  IOLTA accounts are not intended to serve as operating accounts, or to receive investment capital or serve as investor escrow accounts but are instead used by attorneys to receive modest amounts of money or funds that will only be held for a short period of time.  The funds in Beasley Law Group's IOLTA were not nominal—the account took in large deposits for investment purposes, and in steadily increasing amounts.  By 2021, the Beasley Law Group was receiving averaging over $20 million *per month* in its IOLTA at Wells Fargo.  From the IOLTA, Beasley directed transfers, which were executed by Wells Fargo, to the benefit of himself and co-conspirators, and comingled and dissipated on lavish personal expenditures, and disbursed in Ponzi payments to earlier investors to sustain and conceal the scheme.

4.   Wells Fargo has an obligation to know its customers and monitor their accounts for suspicious activity.  National banks like Wells Fargo are obligated to maintain internal control systems to prevent their services from being misused to carry out illegal activity, particularly financial fraud and money laundering.  Wells Fargo uses sophisticated electronic monitoring systems to identify and flag banking

transactions or patterns that raise "red flags" indicative of potential improper or illegal activity. These systems are designed to identify the type of activity carried out by the Beasley Law Group in furtherance of the J&J investment enterprise. It was apparent from the Beasley firm's Wells Fargo IOLTA account statements that the flow of hundreds of millions of dollars in investor funds into Beasley's IOLTA and subsequent transfers to non-clients was not consistent with the legitimate use of that account or any plausible law practice being conducted by Beasley Law Group. An IOLTA account is typically used to receive client funds and in turn transfer those funds to the client, and the attorney may pay their fee from the IOLTA account into the operating account. IOLTA accounts are not properly used to make payments to third parties, to pay the attorney's operating expenses, to purchase automobiles or real estate, or make payments of interest to investors in an investment program operated by the attorney's client. Yet Wells Fargo executed payments from the Beasley Law Group's IOLTA to fund such improper expenditures as the purchase of real estate and at least one luxury automobile, the payment of purported "interest" to one or more investors, and the transfers of millions of dollars to Beasley and his co-conspirators using funds diverted from J&J investors through a series of specious entities they created for the purpose of receiving the stolen funds.

5. Rather than terminating its relationship with the Beasley firm or taking affirmative steps to halt this fraudulent scheme dependent on the misuse of its banking services, Wells Fargo furthered the scheme, carrying out the instructions which allowed Beasley and his co-conspirators to commingle and dissipate investor funds, and continue to seek out new investors in furtherance of their Ponzi scheme.

6. Plaintiff seeks through this action to recover her losses and those of the other J&J investors from Wells Fargo Bank for its aiding and abetting of the scheme to defraud.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because at least one member of the proposed class is a citizen of a different state than Defendant, the class contains more than 100 members, and the total amount in controversy exceeds $5 million, excluding interest and costs.

///

///

8.  The Court has specific personal jurisdiction over Wells Fargo because Plaintiff was injured by its conduct in Nevada and her claims against it arise out of or relate to its wrongful conduct occurring in Nevada.

9.  Venue is proper in this Court under 28 U.S.C. § 1391(b) because Wells Fargo's relevant wrongful conduct occurred in substantial part in this District.

## PARTIES

10.  Plaintiff Stanley Ann Dowdy is a citizen and resident of Reno, Nevada.  Ms. Dowdy invested in J&J.

11.  Defendant Wells Fargo Bank, N.A. is a nationally chartered bank, headquartered in Sioux Falls, South Dakota and with its principal place of business in San Francisco, California.

## RELEVANT NON-PARTIES

12.  Jeffrey Jason Judd is a citizen and resident of Henderson, Nevada.

13.  J&J Consulting Services, Inc. is a Nevada corporation formed in 2005 with its principal place of business in Nevada, and is controlled by Judd.

14.  J&J Consulting Services, Inc. is also the name of an Alaska corporation, incorporated in 2019, with its principal place of business in Nevada, and is also controlled by Judd.

15.  J and J Purchasing LLC is a Florida limited liability company formed in October 2021 with its principal place of business in Nevada, and is controlled by Judd.

16.  Matthew Wade Beasley is a resident of Las Vegas, Nevada and director, president, secretary, and treasurer of Beasley Law Group PC.  He has been licensed to practice law in Nevada since May 2006.

17.  Beasley Law Group, PC is a professional corporation organized in Nevada in 2011 with its principal place of business in Nevada, and is controlled by Beasley.

18.  Judd, Beasley, Beasley Law Group, J&J Consulting Services, Inc. (Alaska), J&J Consulting Services, Inc. (Nevada), and J and J Purchasing, LLC are referred to collectively herein as "J&J."

19.  Plaintiff has not sued the Relevant Non-Parties, because they are currently defendants in an action brought by the SEC, and subject to a temporary restraining order issued by the United States District Court for the District of Nevada at the request of the SEC.  Plaintiff respectfully reserves the

right to amend her complaint should it appear that the Relevant Non-Parties will not be required, through the SEC Action or otherwise, to disgorge their ill-gotten gains.

## OVERVIEW OF RELEVANT BANKING REGULATIONS

20. Federal law requires banks to know their customers and understand their customers' banking behavior. Under applicable regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2). Thus, banks are required to collect information about the holder of each account. When an entity opens an account, the bank must obtain information concerning the individuals who control the account.

21. Wells Fargo is obligated to comply with the Bank Secrecy Act, 12 C.F.R. § 21.21, including regulations broadening its anti-money laundering provisions.

22. The BSA requires Wells Fargo to develop, administer and maintain a program to ensure compliance. The program must be approved by the bank's board of directors and noted in the board meeting minutes. It must: (1) provide for a system of internal controls to ensure BSA compliance at all times, (2) provide for independent testing of the bank's ongoing compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

23. Wells Fargo also must develop a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

24. Customer due diligence programs should be tailored to the risk presented by particular customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the customer and its accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

25. Additionally, Wells Fargo must designate a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA. The compliance officer

must, in turn, designate an individual at each office or branch to monitor the bank's day-to-day BSA compliance.

26. The federal government established the Federal Financial Institutions Examination Council in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions. The FFIEC's Bank Secrecy Anti-Money Laundering Manual (FFIEC Manual) summarizes BSA and anti-money laundering compliance program requirements, risks and risk management expectations, industry sound practices, and examination procedures. The FFIEC Manual is based upon BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies, such as the Federal Reserve, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency. *See* FFIEC BSA/AML Examination Manual, at p. 5 (2010).

27. Banks must also ensure that their employees follow BSA guidelines, and are required to train all personnel whose duties may require knowledge of the BSA on its requirements. Banks make compliance a condition of employment and incorporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations.

28. Banks and their personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering "red flags" set forth in the FFIEC BSA/AML Examination Manual. These red flags include: (1) repetitive or unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round-dollar amounts; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; (8) multiple high-value payments or transfers between shell companies without a legitimate business purpose; (9) payments unconnected to legitimate contracts or revenue sources; (10) fund transfers containing limited content or related-party information; (11) transacting businesses sharing the same address; and (12) an unusually large number of persons or entities receiving fund transfers from one company.

///

29.    As a nationally chartered bank, Wells Fargo was obligated to know the type of banking activity that Beasley Law Group could be expected to conduct in its IOLTA and ensure it conformed to relevant federal banking regulations.  Wells Fargo was required to investigate "red flags" associated with Beasley Law Group's IOLTA.  These included unusual fund transfer activity, such as hundreds of deposits into an attorney trust account in large, round dollar amounts by investors, where funds in such accounts are defined by the Nevada Supreme Court as "nominal in amount or to be held for a short period of time"; hundreds of transactions inconsistent with Beasley Law Group's profile as a solo practitioner law firm, including large dollar amount deposits and transfers of millions of dollars to non-client individuals and vaguely denominated businesses from Beasley Law Group's IOLTA; large fund transfers sent in round dollar amounts; multiple high-value payments and transfers to shell companies without a legitimate business purpose; payments unconnected to legitimate contracts or revenue sources; and transfers from Beasley Law Group to an unusually large number of persons or entities.  In short, it was apparent to Wells Fargo that Beasley Law Group's IOLTA served as the vortex of a Ponzi scheme.

## FACTUAL ALLEGATIONS
### Plaintiff's Investment in J&J

30.    In or around October 2020, Plaintiff Dowdy invested $100,000.00—substantially all of her retirement savings—in J&J.

31.  Plaintiff received a Private Placement Memorandum ("PPM") which directed that investment funds be wired to the Beasley Law Group's IOLTA account at Wells Fargo.

32.  Before investing, Plaintiff understood and was informed that the investment was safe, backed by a promissory note, and that she would receive regular payments of interest on her investment.

33.  Plaintiff received four $9,000 purported interest payments—on January 13, 2021; April 13, 2021; July 14, 2021; and October 14, 2021—before J&J was exposed as a fraud and collapsed.  She now faces the loss of the remaining principal on her investment.

### The J&J Investment Fraud

34.  From at least 2017 until March 2022, J&J offered investments in purported settlement contracts with tort plaintiffs called "purchase agreements."  These investments in the so-called "purchase ///

agreements" were not registered as securities but constitute investment contract securities under federal law.

35.    Beasley and Judd acted as business partners, and Beasley purported to act as an attorney for the J&J enterprise.  Judd and his sales agents told investors that Judd operated a litigation financing business with his attorney, Beasley, whereby Judd invested money in contracts with personal injury plaintiffs while Beasley procured those contracts through his contacts with other **attorneys.**

36.    Judd and his sales agents told investors that Beasley had relationships with many personal injury attorneys around the country, who supplied "purchase agreements" to J&J and its investors.  Judd and his sales agents told investors that, through the J&J enterprise, they could purchase these interests in insurance settlements, and that the invested money would be used to make advance payments to plaintiffs who had reached settlements with insurance companies for tort claims and who were willing to pay a premium to receive a portion of their settlement in advance rather than wait for payment from the insurance companies.  Those plaintiffs allegedly repaid J&J plus interest and fees when the settlement payout was made.

37.    Investors purportedly would receive favorable returns on their investments every 90 days, and that the investment was virtually risk-free.

38.    Judd and his sales agents told investors that the purchase agreements typically came in amounts of $80,000 or $100,000, with a term of 90 days.  At the end of the 90-day period, J&J would reinvest the principal in a new purchase agreement with a new tort plaintiff, and the investor could continue to receive their promised returns every 90 days.  Judd and his sales agents told investors that an investor could get their principal back rather than reinvesting it at the end of the contract term if they so elected.

39.    Judd and his sales agents also told investors that the plaintiffs who entered the purchase agreements paid an administrative fee of $5,000, half of which went to Beasley, and the other half of which went to the plaintiff's attorney.  Judd also represented that Beasley managed the relationships with the various personal injury attorneys and drafted the agreements with the personal injury plaintiffs, while Judd managed the investment side of the business with assistance from his son Parker.

///

40. Judd and his sales agents highlighted the fact that attorney Beasley was involved and that investor funds flowed through Beasley Law Group's attorney trust account.

41. Judd and his network of promoters further represented that the risk from investing in the purchase agreements was almost zero—and described the J&J investments as "immaculate." Judd and his sales agents represented that J&J would repay any investor loss, as he and Beasley kept a separate fund to make investors whole if a personal injury plaintiff failed to pay on a contract. Judd claimed he had "never had to use" this fund because "we've never had one go bad."

42. The representations regarding these investments, as made by Judd and his promoters, were substantially identical and controlled by Judd.

43. Judd and his sales agents were paid commissions for inducing investments. These commissions were improper, as none of them was a registered securities broker or dealer.

44. Over 600 investors, including Plaintiff, invested in the J&J scheme.

### J&J's Representations Were Materially False and Misleading

45. The J&J purchase agreements were fictitious, and the investors' money was not used to purchase interests in personal injury settlements, contrary to J&J's representations to actual and prospective investors.

46. J&J did not invest the investors' funds in contracts with personal injury plaintiffs. Nor did Beasley or Beasley Law Group procure contracts with personal injury plaintiffs and their attorneys.

47. Beasley, Judd, and others used a portion of investors' money to make periodic payments of fictitious "returns" on the purchase agreements to investors in a Ponzi-like fashion. And they used the bulk of investor money to fund lavish lifestyles, buying luxury homes, a private jet, boats, and expensive cars (including two Rolls-Royces, a Bentley and a Ferrari) for themselves and their relatives.

48. Beasley confessed on March 3, 2022 to an FBI negotiator that the J&J business was a Ponzi scheme. Specifically, Beasley admitted that he and Judd returned a small portion of the invested money to investors in Ponzi-type payments to meet their expectations of receiving the promised quarterly returns. The majority of investor funds, Beasley admitted, was spent on lavish personal purchases and to pay others to promote the scheme.

///

49.  To lend credibility to the scheme, Beasley created fake "purchase agreements" between a J&J Consulting entity or J and J Purchasing and various purported tort plaintiffs and their attorneys, which were then shown to J&J investors by Judd and his sales agents.  Beasley often used the names of real lawyers on the fake purchase agreements—yet there were no actual underlying tort settlements and the lawyers whose names appeared on these phony agreements had no connection to Beasley.

50.  Beasley confessed to the FBI that he "never actually talked to" the attorneys whose names appeared on the fictitious contracts.  He confessed that as Judd found more investors, "I made up more attorney's deals and just kept growing it."  Beasley said that investors "would give their money to me, and I would supposedly send it to a bunch of attorneys," but in fact "I kept it and used it to pay, basically pay them back to pay off gambling debts."

51.  Judd and his sales agents told investors that Beasley managed the relationship with the personal injury attorneys, and they could not contact the attorneys or plaintiffs whose names appeared on the purchase agreements.  This prevented investors from learning that those attorneys and plaintiffs were not actually parties to the purchase agreements, and that the agreements were fake.

52.  The J&J investments were sold in violation of state and federal law, in that the J&J investments were securities, and were offered and sold without registration under the Securities Act of 1933, despite the fact no exemption from registration applied.  The J&J investments were also sold in violation of the Securities Exchange Act of 1934, in that they were offered and sold through the use of false, misleading and incomplete statements, and uniformly omitted to state material facts, including that the J&J enterprise was a Ponzi scheme, and that the returns investors were receiving on their investments were in fact diverted from later investors, and that their own funds had been applied to the personal use of the co-conspirators.  The J&J investments were further sold in violation of federal and state law in that none of the individuals soliciting investments in the J&J enterprise was registered to offer and sell securities in accordance with federal law.

**Wells Fargo Had Actual Knowledge of and Substantially Assisted the J&J Fraud**

53.  J&J provided investors and their brokers with wiring instructions directing that investment funds be wired to Beasley Law Group's Interest on Lawyers' Trust Account ("IOLTA"), held at Wells ///

Fargo, account number XXXXXX5598 ("IOLTA 5598"). The PPM Plaintiff received directed investors to wire their money to IOLTA 5598.

54.   An IOLTA is a specialized trust account designed for lawyers to hold modest amounts of money for multiple clients, including the proceeds of personal injury settlements or other similar matters.

55.   According to the American Bar Association, an IOLTA is a means "of raising money for charitable purposes, primarily the provision of civil legal services to indigent persons."  The account draws interest, which is typically disbursed to the relevant state bar, in situations where "the amount of money that a lawyer handles for a single client is quite small or held for only a short period of time."

56.   Similarly, Nevada Supreme Court Rule 217 defines IOLTAs as accounts set up by a Nevada attorney to hold clients' funds "nominal in size or . . . to be held for a short period of time."

57.   Typically, an IOLTA may also be used to receive the proceeds of a personal injury settlement, which are then divided between the client and the lawyer.  The movement of money in and out of any IOLTA account differs from an ordinary business account.  Funds transferred to an IOLTA account typically come from insurers or other third-party payors making deposits to the account for the benefit of the attorney's client. In other cases, a client may deposit funds into an IOLTA account, that are then earned by the attorney as the attorney works off a retainer.  Once in the IOLTA account, the funds are disbursed either to the client or the attorney.  Attorneys are not permitted to use IOLTA accounts as operating accounts, and it is improper for attorneys to pay third parties from an IOLTA account.

58.   In the Wells Fargo "Business Account Application" completed by Beasley to open the IOLTA 5598 account, Beasley represented that Annual Gross Sales for the Beasley Law Group was $350,000. Beasley was the sole signatory for IOLTA 5598. As far as Wells Fargo knew, Beasley was operating a solo practice, focused primarily on family law.

59.   Beasley's IOLTA at Wells Fargo was not generally used in connection with legal services. To the contrary, the high volume of investment transfers and high dollar amounts involved were extremely unusual for an IOLTA account.  Instead, amounts significantly greater than a typical retainer check deposited by a lawyer into an IOLTA were wired directly by investors, or paid via cashier's check by brokers, into Beasley's IOLTA. Beginning almost immediately, the average monthly funds flowing through IOLTA 5598 increased exponentially, from $583,000 per month in 2017 to $1,370,00 per month

in 2018, $4,147,000 per month in 2019, $9,240,00 per month in 2020, $20,453,000 per month in 2021, $28,399,000 per month to in 2022. From January 1, 2017, through March 15, 2022, $491.5 million was deposited in IOLTA 5598. The explosive growth of the average monthly balance in the IOLTA 5998 account could not be attributed to any underlying change in Beasley's law practice and served as a red flag that Beasley was using the IOLTA 5998 account for illicit purposes.

60.    The majority of deposits to the IOLTA 5998 account were in round dollar increments of $100,000 or $80,000, as called for by the subscription agreements. These recurring, large round dollar deposits were also highly atypical for an IOLTA account and constituted an additional red flag indicative of improper use of IOLTA 5998.

61.    The transfers out of the IOLTA 5998 account also raised a red flag. Large sums, in amounts greater than most individual deposits, would not normally be disbursed from an IOLTA to other accounts not held by either the lawyer or client.  Yet transfers in excess of individual deposits regularly were made out of the 5998 IOLTA, to dissipate the proceeds of the J&J scheme among the co-conspirators. Wells Fargo observed these irregular transfers out of Beasley's trust account on an ongoing basis. Wells Fargo saw these payments being made out of the 5998 IOLTA, which were inconsistent with the customary use of an IOLTA account and a red flag for fraud.  Beasley made repeated payments to co-conspirators from the 5998 IOLTA, transferring $411 million or approximately 84% of the funds transferred out of the IOLTA 5998 account from January 2017 to March 2022 to J&J co-conspirators, including transfers to or for the benefit of Jeffrey Judd, Matthew Beasley, Shane Jager, Christopher Humphries, Denny Seybert, Anthony Michael Alberto, Jr., (collectively, "Co-Conspirators"), and J&J Consulting Services (controlled by Jeffrey Judd), The Judd Irrevocable Trust, Stirling Consulting (controlled by Shane Jager), CJ Investments LLC (controlled by Christopher Humphries), PAJ Consulting Inc., BJ Holding LLC, and ACAC LLC.  In total, J&J Consulting Services received $313.7 million, Stirling Consulting received $37.2 million, CJ Investments LLC received $31 million, Beasley Law Group PC received $17.1 million, and Triple Threat Basketball, LLC received $12.3 million.  Many of the foregoing entities had no business presence or operations independent of their role in the scheme and had Wells Fargo conducted a simple search using online tools available to large banks, Wells Fargo would have readily determined that Beasley was using the IOLTA 5998 account for illicit purposes.

62. The indicia of suspicious fundraising and fraudulent activity in IOLTA 5998 were particularly noticeable because he purported to maintain the IOLTA primarily for his own family law practice. Such a practice would not be expected to receive hundreds of millions of dollars from individuals in round dollar amounts or make the other types of transfers made by the Beasley law firm's IOLTA.

63. A further red flag visible to Wells Fargo were the transfers out of the IOLTA 5998 account for expenditures on real estate and personal property. IOLTA accounts are not to be used for payment of attorneys' personal or business expenses. No information available to Wells Fargo justified Beasley Law Group's use of the 5998 IOLTA for, among other things, the transfer of over $4 million to title companies, presumably for the purchase of real estate, or a transfer of over $95,000 to CJF Automotive, LLC, an automotive enterprise based in Las Vegas.

64. Wells Fargo has internal controls, knows the hallmarks of a Ponzi scheme, and is a sophisticated financial institution that owes duties under federal law to know its customers and their businesses and to monitor their accounts for suspicious activity.

65. The highly atypical flow of tens of millions of dollars into Beasley's IOLTA, and the disposition of those funds in a manner inconsistent with any legitimate law practice, was apparent to Wells Fargo. The bank statements for Beasley's IOLTA at Wells Fargo made it clear that the J&J investment enterprise was operating as a Ponzi scheme.

66. Despite the many indicia of misuse of the IOLTA, Wells Fargo looked the other way. Rather than refrain from doing business with Beasley Law Group, Wells Fargo continued to accept investor deposits and process the improper transfers needed to carry out the J&J fraud—sustaining the Ponzi scheme and allowing the investments of Plaintiff and other class members to be converted to unauthorized and unlawful purposes.

## CLASS ACTION ALLEGATIONS

67. Plaintiff brings this suit as a class action on behalf of herself and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of a class of all persons who invested in the J&J investment scheme.

68. Excluded from the class are the Relevant Non-Parties, their parents, affiliates, subsidiaries, agents, legal representatives, predecessors, successors, assigns, employees; any entity in which any

Relevant Non-Party has a controlling interest or which has a controlling interest in a Relevant Non-Party; and the judicial officers to whom this matter is assigned and their immediate family members.

69.  Numerosity.  The class members are too numerous to be practicably joined.  The class members are identifiable from information and records in the possession, custody, or control of Wells Fargo or Relevant Non-Parties.  Notice of this action can be provided to all members of the class, and the disposition of their claims in a single action will provide substantial benefits to all parties and to the Court.

70.  Typicality.  Plaintiff's claims are typical of the claims of other members of the class.  Plaintiff and each class member invested in the J&J scheme and were subject to the wrongful conduct alleged in this complaint.

71.  Adequacy of Representation.  Plaintiff is a member of the class and will fairly and adequately represent and protect its interests.  Plaintiff has no interests contrary to or in conflict with the interests of the other class members.

72.  Plaintiff's counsel are competent and experienced in class action and investor fraud litigation and will pursue this action vigorously.

73.  Commonality and Predominance.  Common questions of fact and law exist as to all members of the class and predominate over any questions pertaining to individual class members.  Among the questions common to the class are:

   a.  Whether J&J committed fraud and/or breached duties to Plaintiff and members of the class;

   b.  Whether Wells Fargo aided and abetted, joined, and/or participated in J&J's fraud and/or breach of duties; and

   c.  Whether, in view of their investment losses, Plaintiff and class members are entitled to recover damages.

74.  Superiority.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Although each class member paid at least thousands to dollars to invest in the relevant investments, the cost of litigation will be high.  The factual issues in this case are complex and detailed, extend over several years, and relate to many transactions.  Absent a class action, most

members of the class would likely find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy.

75. Class treatment of common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication. Class treatment will avoid the substantial risk of inconsistent factual and legal determinations of the issues in this lawsuit.

## TOLLING OF THE STATUTES OF LIMITATIONS

76. Defendant Wells Fargo and the Relevant Non-Parties, aware of the illegal J&J scheme and its injurious effects, fraudulently concealed the scheme and that the fact that the investments were not as represented.

77. J&J's fraudulent misrepresentations had the effect of concealing that the enterprise was, in fact, applying new investor funds to fund existing investors' returns. Wells Fargo and the Relevant Non-Parties fraudulently concealed the J&J scheme by failing to report it while carrying out the account transactions on which the scheme relied.

78. Wells Fargo and the Relevant Non-Parties had superior and exclusive knowledge of the J&J investment fraud and were aware that Plaintiff and class members did not know about that fraud. Despite reasonable diligence on their part, Plaintiff and class members were kept ignorant by Wells Fargo and the Relevant Non-Parties of the factual bases for their claims for relief.

79. Plaintiff and class members reasonably relied to their detriment on Wells Fargo's and the Relevant Non-Parties' fraudulent concealment of their violations. As a result of this concealment, Plaintiff and class members did not believe that it was necessary to file a lawsuit. Plaintiff and class members did not discover, and exercising reasonable diligence could not have discovered, the facts establishing Wells Fargo's and the Relevant Non-Parties' violations or the harm caused thereby until, at the earliest, Beasley's arrest on March 3, 2022. Because, until then, no reasonable plaintiff could have discovered the facts constituting Wells Fargo's and the Relevant Non-Parties' violations, all applicable statutes of limitation were tolled until that date.

///

///

**AGENCY, ALTER EGO, AND CO-CONSPIRATOR ALLEGATIONS**

80.  At all relevant times, Wells Fargo and each Relevant Non-Party was a principal, agent, alter ego, joint venturer, partner, or affiliate of Wells Fargo and each of the other Relevant Non-Parties, and in doing the acts alleged herein, was acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship.  Wells Fargo and each Relevant Non-Party had actual knowledge of the wrongful acts of Wells Fargo and each of the other Relevant Non-Parties; ratified, approved, joined in, acquiesced, or authorized the wrongful acts of Wells Fargo and each Relevant Non-Party; and retained the benefits of those wrongful acts.

81.  At all relevant times, Wells Fargo and each Relevant Non-Party was a co-conspirator of Wells Fargo and all other Relevant Non-Parties.

82.  Wells Fargo aided and abetted, encouraged, and rendered substantial assistance to each of the Relevant Non-Parties in jointly perpetrating the fraudulent scheme upon Plaintiff and the class.  In taking action, as alleged herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts and other misconduct set forth herein, Wells Fargo acted with an awareness of its wrongdoing and realized that its conduct would substantially aid the accomplishment of the wrongful acts and purposes set forth herein.

**FIRST CLAIM FOR RELIEF**
**Aiding and Abetting Fraud**
*(Against Wells Fargo)*

83.  Plaintiff re-alleges and incorporates by reference each and every allegation in the foregoing paragraphs, as if they were fully set forth herein.

84.  As alleged more fully above, J&J intentionally perpetrated fraud on the investing public through a series of materially false and misleading statements and omissions.

85.  Plaintiff and class members reasonably relied to their detriment upon J&J's materially false and misleading statements and omissions when they purchased the relevant securities.

86.  Defendant Wells Fargo knowingly and substantially assisted Beasley Law Group and J&J in unlawfully defrauding Plaintiff and the class, in at least the following respects:

    a.  Accepting for deposit funds derived from the sale of unregistered securities;

    b.  Commingling investment funds;

  c. Executing atypical banking transactions to service Beasley Law Group's IOLTA used to perpetrate the fraud;

  d. Carrying out improper and atypical financial transactions such as transfers of approximately $491.5 million through a single attorney trust account;

  e. Failing to identify, monitor, or exercise due diligence related to regulatory and compliance "red flags";

  f. Failing to implement and adhere to compliance and monitoring protocols concerning the use of Plaintiff's and class members' investment funds;

  g. Failing to identify, monitor, or exercise required due diligence in relation to the existence or nonexistence of bona fide purchase agreements for interests in tort settlements paid or owed by insurance companies to personal injury plaintiffs; and

  h. Failing to prevent, report, or otherwise take corrective action in response to the J&J's misappropriation and misuse of investor funds.

87. In connection with providing substantial and material assistance to Beasley Law Group and J&J, Wells Fargo was aware of its role in the Ponzi scheme and acted knowingly in furthering it.

88. Wells Fargo substantially benefited from its participation in the Ponzi scheme.  The scheme caused Wells Fargo to earn income from fees and from investing capital derived from J&J investors.

89. As a direct and proximate result of Wells Fargo's aiding and abetting of fraud, Plaintiff and class members have been damaged in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**Aiding and Abetting Breach of Fiduciary Duty**
***(Against Wells Fargo)***

90. Plaintiff re-alleges and incorporates by reference each and every allegation in the foregoing paragraphs, as if they were fully set forth herein.

91. Relevant Non-Parties Judd, Beasley, and Beasley Law Group maintained control over the J&J enterprise and the purported investment business associated therewith.

92. By reason of their controlling positions, actions, and direct and indirect representations to Plaintiff and class members, Judd, Beasley, and Beasley Law Group owed them the fiduciary duties of loyalty and care, and to deal honestly and in good faith.

93. Beasley Law Group maintained an IOLTA trust account at Wells Fargo into which Plaintiff's and class members' money was deposited. As trustee over those funds, Beasley Law Group owed fiduciary duties to Plaintiff and class members.

94. Furthermore, Judd, Beasley, and Beasley Law Group knew that Plaintiff and other investors were vulnerable and trusted that their money would be properly invested. Judd, Beasley, and Beasley Law Group had a duty to act for the benefit of Plaintiff and class members upon matters within the scope of their relationship, and in particular, to use their investment funds to purchase interests in insurance settlements, and to collect payments on those settlements and deliver the money to Plaintiff and class members.

95. By selling Plaintiff and class members securities pursuant to false representations, and by misappropriating, commingling, and otherwise misusing investor funds, including through improper use of the IOLTA, Judd, Beasley, and Beasley Law Group breached fiduciary duties they owed to Plaintiff and class members.

96. Wells Fargo knew that Beasley Law Group's account was an IOLTA, containing funds held in trust for the benefit of Beasley Law Group's clients. As a participant in Nevada's IOLTA program, Wells Fargo knew that funds held in the account could not be commingled or used by Beasley personally or for any improper purpose.

97. Wells Fargo substantially assisted in Judd, Beasley, and Beasley Law Group's breaches of fiduciary duty while recognizing those readily apparent breaches.

98. As a direct and proximate result of Wells Fargo's aiding and abetting of breach of fiduciary duty, Plaintiff and class members have been damaged in an amount to be determined at trial

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A. Certifying this action for class treatment, appointing Plaintiff as class representatives, and appointing Plaintiff's counsel as class counsel;

B. Awarding damages, including pre-judgment interest, on each Claim for Relief in an amount to be determined at trial;

C. Awarding reasonable attorneys' fees and costs of litigation; and

D.  Granting such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff requests a jury trial for any counts for which a trial by jury is permitted by law.

Dated:  April 15, 2022

By:   /s/ *Mark Albright*
G. MARK ALBRIGHT, Esq. (State Bar No. 1394)
DANIEL R. ORMSBY, Esq. (State Bar No. 14595)
**ALBRIGHT STODDARD WARNICK & ALBRIGHT**
801 S. Rancho Dr., Suite D4
Las Vegas, NV 89106
Telephone: (702) 854-2791
gma@albrightstoddard.com
dormsby@albrightstoddard.com

Adam E. Polk (*pro hac vice* application forthcoming)
Jordan Elias (*pro hac vice* application forthcoming)
Makenna Cox (*pro hac vice* application forthcoming)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
apolk@girardsharp.com
jelias@girardsharp.com
mcox@girardsharp.com